UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

EARL L. OAKS, JR.           )
                            )
V.                          )     NO. 2:13-CV-43
                            )
CAROLYN W. COLVIN,          )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's applications for disability insurance benefits and supplemental security income were denied following an administrative hearing before an Administrative Law Judge ["ALJ"]. This is an action for judicial review of that denial. Plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 12], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 14].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 51 years of age at the time of the ALJ's adverse decision. He has a high school education. He has past relevant work experience as an auto parts salesperson, which is generally semi-skilled an light but heavy as performed by the plaintiff; and skilled medium work as a computer repairman and sales assistant.

Plaintiff alleges his disability onset date was September 11, 2007. His primary claim is that he has severe mental impairments. However, during the time the administrative process was going on, he asserts that he has a further severe physical impairment of degenerative disc disease. He is also obese.

This case was originally decided by the same ALJ on July 7, 2009 (Tr. 83). However, on November 24, 2010, the Appeals Council remanded the case to the ALJ for further consideration of the plaintiff's mental impairments and to analyze the effect of his obesity on his ability to engage in substantial gainful activity. (Tr. 91).

All of plaintiff's medical care has been provided by the Veterans Administration. These records are summarized by the ALJ as follows:

2

Veterans Administration records reveal that the claimant has been seen for general medical complaints and medication management. His primary treatment has been for his mood disorder and PTSD (post-traumatic stress disorder). He was seen in August 2006 for chest x-ray-calcified granuloma I again seen in the right upper lobe compatible with old granulomatous disease. Follow-up CT was recommended for further evaluation. This showed some subtle hypodensities in the two kidneys which could not be further characterized; however, renal ultrasound was unremarkable. Mental health treatment note reveals that the claimant was initially seen for depressive symptoms from march 2007–diagnosis was adjustment disorder with depressed mood and nacissistic traits. He states that Venlafaxine was not in the computer yet and requested that it be mailed. He was seen in may for tooth pain and was given an injection for suspected tooth abscess. He was told to follow-up with PCP for uncontrolled hypertension and was placed on medication. He was morbidly obese at a weight of 256 pounds. He subsequently underwent extraction of teeth. It was noted that the exeriences Von Willenbrand's disease (a blood disorder), but has Amicar to take if the bleeding did not stop. The claimant reported that his adjustment disorder was doing better with Venlafaxine, his mood was improved. He was working full time and enjoying his work. It was noted that his hypertension does have some element of white coat syndrome, but since his blood pressure was less than optimal, his HCTZ was increased. In June, the claimant requested increase of medication due to increasing anxiety and depression, and this was done. The claimant was alert and oriented x 3, cooperative, and goal directed with no cognitive deficits. Insight and judgment were good.

VA records reveal that the claimant was seen November 21, 2007. He had no service connected disabilities and no rated disabilities. He presented with his wife, who was in nursing school, with a very high anxiety level to the point "that was the straw that broke the camel's back," and since then he cannot maintain employment. His mother passed away two years ago, but it was in the back seat of his car while he was trying to get her care. When he received his inheritance, he spent it all very quickly then could not recall what he did with it despite his wife trying to redirect him. IN regard to military trauma and when his symptoms began, he can "recall the exact instant when in the military a helicopter came down and chopped the heads off 8 peole." He had significant hyperstartle response and was very articulate about his experiences, but spent a great deal of the encounter clenching his hands and requesting that his wife speak for him. He endorsed irritability, mood swings, flashbacks, avoid talking about incidences, TV, news, anything to do with the content of his trauma. Diagnostic impressions were: adjustment disorder, mood disorder, not otherwise specified: and rule-out post traumatic stress. No cognitive deficits were noted. Insight and judgment were deemed good. The claimant was started on medication for depression and benign essential hypertension. Risk factors did not include diabetes millitus, a family history of diabetes, or sedentary lifestyle, but did include obesity. The claimant called in November stating that the Loarzepam wears off too quickly. He wanted to discuss medication changes. He wanted to remain on the medication and have dose

3

adjusted in regard to anxiety. He was working on claims and it was very stressful as he and his wife were behind on car payments. He inquired if he should work–and it was suggested that perhaps he could work, part-time while he was in the midst of treatment adjustments. In January 2008, the claimant's chief complaint was the he was almost out of Lorazepam–had two tabs left–and, at times, he takes two when he was really stressed. He says he was told that this was okay by the physician prescribing the medications. When seen in February, 2008, the claimant reported that he was doing fairly well. He reported medication compliance aside from stating, "sometimes I have to take 6 Ativan in a day's time." He reported increased anxiety, especially when confronted by "jerks." He was sleeping and eating fairly well and was excited about starting a new career. He was going to truck driving school for approximately three months. He was informed that if he continues to overuse his medication, this will be counted as a violation of his contract and they would no longer be able to provide him with controlled substances due to safety reasons.

When seen in April, the claimant described his mood as "wishing I had something to do." He reported applying for food stamps and "trying to get disability," says he has "nightmares of getting beat up in the military."
Also says he saw a propeller come off a plane and "saw heads flying." He said that, on average, he was using two Ativan a day due to panic attacks. In August 2008, the claimant reported that two years ago his mother died in the back seat and "apparently" started the PTSD symptoms and relates traumas sustained in the military. He was concerned with blood sugars and discomfort in rectal area and changes in urinary stream. When seen in December 2008, the claimant reported that his Atrivan sometimes "runs out on me." He reported that increased Effexor improved his mood and Geodon at bedtime helps calm him and helps with sleep. He was advised to take Geodon with food and educated that absorption is only 20 percent when taken without food. Cognitive function was alert with intact immediate memory. His insight and judgment were fair.

In January 2009, the claimant was seen for post-traumatic stress referral. Military history: he served in the U.S. Navy from January 18, 1980 to January 19, 1982: completed basic training at Orlando Naval Base and received training in electronics: he began A school in that area of specialization when he was removed and was sent to the fleet because "I was not performing as expected." He served aboard the USS Fairfax from January 1981 until his discharge January 1982–General discharge–under honorable conditions. "Burden to command due to substandard performance or inability to adapt to military service." He was requesting treatment in the PTSD program and was placed on a waiting list for either March or July class of 2009.

It was noted that the claimant had a certificate in computer use, but had apparently not been able to obtain work in this field. He reportedly had been a jack of all trades but master of none, when it comes to work. His longest employment was Radio Shack for seven years. He last worked the summer of 2007, when he worked in the seafood department at Food City and was fired the next day for being "I was my normal me," and aggravating and annoying others he worked with. He

4

denied any mental health treatment he received at this VA for the past two years.

It was noted that the claimant drank heavily in the milatary (so much so that he was sent to an "Alcohol Education Course" per DD214, but has not used alcohol in years. He denied flashbacks. He described hyperarousal symptoms including poor sleep, (stated he would not sleep at all if not for medications), irritability and angry outbursts and fairly severe hypervigilance.

When seen in July, the claimant reported being depressed mostly due to being denied disability. He stated that the needs disability due to anxiety, panic attacks (due to agoraphobia) and depression. He endorses a lot of stress due to finances, stating that they are drowning in bills, and that their electricity is about to be shut off. He requested a letter be written to help with an appeal for disability. He claimed that he is actively looking for employment, but is concerned that his irritability and anxiety will hinder the process as well as his job performance if hired. He reported that he was sleeping better with increase in Geodon and that his depression is "absolutely" decreased with Effexor. He takes Atian QID and claims "it's the only thing that gets me through the day." He was alert and oriented x 4, with good insight and judgment.

In May 2010, the claimant presented with lower back pain, which began about two weeks ago and was currently having numbness in his left foot. He had no previous back pain, but previous history of kidney stones. Active problems included : social; vitamin D deficiency; hydradenitis, sensorineural hearing loss, bilateral; tinnitus; male erectile disorder; hypertrophy (benign of prostate with urinary obstruction; irritable bowel syndrome; other antipsychotics, neuroleptics, and major tranquilizers causing adverse; PTSD, adjustment reaction, mixed emotional; kidney stones; Von Willebrand's disease, benign essential to hypertension; adjustment disorder, with depressed mood and morbid obesity.

In July 2010, the claimant subsequently reported that his anxiety and panic attacks were manageable as long as he takes his medications. He reported that financial stress has decreased greatly since his wife is working full time. He reported a recent trip to the ER for treatment of back pain and was advised of abnormal findings on x-rays, which showed multi-level mild-t-moderate degenerative change without visible fracture and without loss of alignment. Bone scan was unremarkable. In November, the claimant reported that his 20-year old niece came to live with them and that he was occupied with teaching her how to drive and other daily living needs. He was disappointed that he had not been able to find his family from his biological father's side. He understood that he needed to lose weight and diet and exercise was discussed. It as noted that he was still waiting on his disability claim.

When seen in July 2011, the claimant achieved a Back Depression Inventory score of 17, consistent with mild level of depression. His score on the Mississippi Scale for Combat-Related PTSD was 94, which failed to reach the suggested cutoff of 107 and would ordinarily not be considered consistent with a PTSD diagnosis–however, since previous evaluations diagnosed PTSD, it was considered a false negative. It was noted that the claimant was able to attend and concentrate well. Abstract ability was intact as he was able to converse in more complex though

5

processes. Insight was limited, but judgment was good (Exhibits 1F, 5F, 10F, 12F, 15F and 16F).

The State Agency physician found that the claimant's physical impairment(s) was/were not severe, singly or combined (Exhibits 2F and 6F).

The State Agency psychologist found that the claimant had no restriction in the activities of daily living, mild difficulties in maintaining social functioning, moderate limitations in maintaining concentration, persistence or pace and no episodes of decompensation. The State Agency psychologist found that the claimant was able to sustain concentration, persistence and pace for simple tasks, detailed with some difficulty at times, but still could perform them (Exhibits 3F, 4F, 7F and 8F).

December 4, 2008, Kelly King, M.D. completed a form to a request for medical information states that the claimant was physically or mentally unfit for employment or training for employment indefinitely. (Exhibit 14F).

....

March 14, 2011, Beth Ballard, M.A., examined the claimant for consultative psychological evaluation with specific testing to include TOMM, SIRS and PAI. On PAI, there is no evidence to suggest that he was motivated to portray himself as being relatively free of common shortcomings or minor faults. However, certain aspects of the profile raise the possibility of denial with problems with drinking or drug use, as individual with similar personality characteristics typically report greater involvement with alcohol or drugs than was described with this claimant. On SIRS, the claimant had one score in the definite range which was reported symptoms and four were withing the probable range for malingering which were the BL, SU, SEL, and SEV subscales. His scores indicate that he was feigning or exaggerating. His TOMM scores were 28 on trial one, 37 on taial two and 43 on the retention trial.

....

Ms. Ballard states that the claimant reports significant depression and anxiety and symptoms of PTSD indicating that he has experienced depression for 30 to 40 years. However, the results of his testing indicate that he is likely feigning or exaggerating some of his mental health issues and appears to be credible, but may become mildly dramatic when discussing the accident aboard ship. Diagnoses were: dysthymic disorder; post-traumatic stress disorder; panic disorder without agoraphobia; malingering (gross exaggeration of problems); and boderline peronality traits. Despite the feigning or exaggerating mental health issues, Ms. Ballard completed a mental assessment which conflicts with her diagnoses.[1]

(Tr. 14-19).

---

[1] The ALJ goes on to explain how Ms. Ballard's examination note and her ultimate opinion conflict. This will be discussed further on in this report and recommendation.

At the administrative hearing, the ALJ called Ms. Donna Bardsley, a vocational expert ["VE"]. He asked her to assume a hypothetical individual "is currently 51 years of age, has education as testified to you by the claimant and as evidenced by the claimant file and has past relevant work as you've identified. I would like you to assume that regardless of exertional limitations, that this hypothetical individual has the non-exertional limitations as set forth in Exhibit 8-F..." When asked "what impact, if any would these limitations have on the hypothetical individual's ability to perform gainful employment?" Ms. Ballard responded "There wouldn't any jobs."That is what the transcript says, verbatim.[2] Two other hypotheticals were asked. The ALJ asked what impact Dr. King's limitations would have on plaintiff's ability to work. She replied "there wouldn't be any jobs." Likewise, if the plaintiff's hearing testimony and that of his wife were credible, she answered "there wouldn't be any jobs."

In his hearing decision, the ALJ found that the plaintiff had severe mental impairments of adjustment disorder with depressed mood and post-traumatic stress symptoms. While in the previous decision he found the plaintiff's diabetes and hypertension to be severe impairments (Tr. 85), albeit ones which were controlled and did not impose significant restrictions, in the present decision he simply found they were not severe. He considered the plaintiff's obesity, but stated that the medical records did not indicate any significant limitations imposed by it. He found that none of the impairments alone or in

---

[2]However, the Court believes this is just an error in the recording or transcribing of the proceedings. Plaintiff's capable counsel did not raise this as an issue. If it were true, then he could not return to his past relevant work, and at the least, further proceedings would be necessary.

7

combination met or equaled a listed impairment. (Tr. 11-12).

In his previous decision, the ALJ found that the plaintiff had moderate restrictions in activities of daily living; concentration, persistence and pace; and in social functioning. (Tr. 86). In the present decision, he found that the plaintiff had only a mild restriction in activities of daily living and social functioning due to his reported activities, although he again found that the plaintiff had a moderate restriction in concentration, persistence and pace. (Tr. 13).

He found that the plaintiff had the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels, but with the limitations imposed by the State Agency psychologist in Exhibit 8F (Tr. 376), and that he was able to understand and remember simple through detailed tasks with appropriate concentration, persistence and pace despite periods of increased symptoms; with social interaction and adaptability not significantly impaired. (Tr. 13).

After discussing the medical records as set out verbatim above, the ALJ gave great weight to the State Agency psychologist in his August 19, 2008 assessment, Exhibit 8F noted in his RFC finding. Dr. Kelly King, a psychiatrist who treated the plaintiff, filled out a form sent to him by the State Agency while it was investigating the plaintiff's applications, and answered the **question printed on the form**, which was that the plaintiff was "physically or mentally unfit for employment or training for employment." In other words, that was the information sought by the State Agency, with nothing else being asked to support the answer or room for elaboration on symptoms, etc. The ALJ however, after stating how a treating physicians opinion was entitled to great weight, said of Dr. King's answer to the question printed on the form "statements that a claimant is disabled, unable to work, can or cannot

8

perform a past job, meets a Listing, or the like, are not medical opinions, but are administrative findings of a case...Such issues are reserved to the Commissioner...but must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence." The ALJ then stated that Dr. King was "not qualified to offer any assessment regarding the claimant's physical ability for employment or training for employment...." Also, the ALJ found that Dr. King's assessment was "inconsistent with the narrative summary from the Veterans Administration..." set out above. (Tr. 17-18).

Of course, the ALJ is correct that, in the Social Security law sense, the opinion of a doctor that a patient is physically or mentally unfit for employment or training for employment is a legal issue for the Commissioner to determine. It is, however, ridiculous for the State Agency to send a form asking that very question to a doctor, when the answer is "worthless." A governmental agency should not craft a series of questions which can only be answered with an "x" in a box, and then say that the doctor's opinion expressed by making that "x" was something he or she was not qualified to opine upon. One cannot help but ponder what weight would have been attributed had Dr. King checked the box which said "this person is physically or mentally fit for employment or training"? The ALJ is, however, also correct that he can decide to give little weight to give an opinion if other substantial evidence contradicts the opinion.

The ALJ then considered and evaluated the opinion of Beth Ballard, who performed a consultative psychological exam on plaintiff on March 14, 2011. He found that her "mental assessment...conflicts with her diagnoses." This was because her finding from testing that

9

plaintiff possibly "exaggerated his problems on the job environment" conflicts with her opinion that he has marked difficulties dealing with supervisors, co-workers, and changes in the work environment. Based upon this, and the plaintiff's activities, he obviously found the plaintiff was not totally credible in his subjective complaints. The ALJ reaffirmed the great weight given to the 2008 report from the State Agency psychologists, "even though they did not have the benefit" of the test scores regarding malingering to assess his credibility back then. (Tr. 19).

The ALJ then found that the plaintiff could return to his past relevant work with his RFC. Accordingly, the ALJ found that the plaintiff was not disabled. (Tr. 19).

The plaintiff asserts that the ALJ erred in giving no weight to Ms. Ballard's assessment other than her test results which indicated malingering, and his failure to adequately consider the plaintiff's GAF ["Global Assessment of Functioning"] found throughout the record. Also with respect to the ALJ's discussion of plaintiff's mental impairments, he argues that the ALJ gave too much weight to the 2008 opinions of the State Agency psychologists given the plaintiff's intensive treatment history since then, and the findings of Ms. Ballard. He also asserts the ALJ erred in his determination that the plaintiff was not credible, and in failing to find that the plaintiff had a severe impairment due to his degenerative disc disease.

GAF scores, while a part of the mix in evaluating a person's mental impairments, in and of themselves do not foreclose a finding that an individual is still capable of substantial gainful activity. As the Sixth Circuit stated in *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496 (6th Cir. 2006), "we are not aware of any statutory, regulatory, or other authority

requiring the ALJ to put stock in a GAF score in the first place." The Court went on to say "[i]f other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is as low as Kornecky's or even lower." *Id.* at 511, citing *Jones v. Comm'r of Soc. Sec.,* 336F3d. 469 (6th Cir. 2003).

A more serious question is raised by the ALJ's discounting of Ms. Ballard's assessment and continued reliance on a then 3 year old opinion by the State Agency psychologist. This is a close question, but a question which the ALJ had to decide as the trier of fact. If he were substituting his own psychological opinion for that of Ms. Ballard, then a remand would certainly be in order. However, he pointed out specific portions of Ms. Ballard's narrative which were in conflict with her mental assessment. He also concluded that the State Agency opinion was still viable due to the fact that the State Agency psychologist did not have the test results of Ms. Ballard which indicated a strong likelihood of malingering. He was not obliged to accept her conclusions when there were, in his mind, compelling reasons to reject those conclusions. Evidence of symptom embellishment by a claimant is damning in a mental disability context, where there are no MRI's and few objective tests to gauge the severity of an impairment. The Court can simply not say the ALJ erred in this respect.

With respect to the plaintiff's credibility, the ALJ was the finder of fact, and his credibility determinations are not to be taken lightly. Here, there were a host of reasons given in the decision to support his findings in this regard. The plaintiff's rather extensive daily activities, the test findings of Ms. Ballard, and the many references in the medical

11

records to good results when plaintiff took his medications all support the ALJ's finding. Also, the opinion of the State Agency psychologist, which stood the test of time, is indicative that the plaintiff is exaggerating his symptoms. More than once he spoke of his strong desire to obtain benefits. Naturally, a person who is disabled should want benefits if he or she applies for them. But to dwell upon it in conversations with mental health providers suggests at least a motive for embellishment.

Plaintiff also asserts that the ALJ erred in not finding that his degenerative disc disease was a severe impairment. At Step Two of the evaluation process, the plaintiff must prove at least one impairment that is severe, or else the process ends and they are found not disabled. However, if any severe impairment is found, the ALJ must proceed to determine the plaintiff's residual functional capacity. The ALJ must also consider the effect of non-severe impairments in determining the RFC. Here, the ALJ noted the plaintiff's back problems in 2010, and thoroughly discussed them in his decision. (Tr. 12). He noted that by September 2010, according to the records (Tr. 506), plaintiff's back pain had almost completely resolved. Also, the ALJ noted (Tr. 19) that even if the plaintiff's back problem limited him to medium work, he could still do his past relevant work according to the VE. (Tr. 50). A finding that the back impairment was severe would not have impacted the ALJ's decision, or its efficacy.

There was substantial evidence to support the ALJ's decision, and his legal analysis comported with the law and the regulations. Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 12] be DENIED, and the

defendant Commissioner's Motion for Summary Judgment [Doc. 14] be GRANTED.[3]

Respectfully submitted,

  s/ Dennis H. Inman
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).